# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00789-CV

---

**Appellants, Janis Fair and River Rock Event Center, Inc.// Cross-Appellants, Gabriela Powell, Keith Powell, and Grove Operating, LLC**

**v.**

**Appellees, Gabriela Powell, Keith Powell, and Grove Operating, LLC// Cross-Appellees, Janis Fair and River Rock Event Center, Inc.**

---

**FROM THE 274TH DISTRICT COURT OF COMAL COUNTY
NO. C2022-1731C, THE HONORABLE STEPHANIE BASCON, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

This appeal arises from a family dispute about the existence of an easement and the loss of a house sale because of that dispute. Janis Fair and River Rock Event Center, Inc. (the Fair Parties) appeal a final judgment rendered after a bench trial awarding damages for trespass and attorney's fees to Fair's granddaughter, Gabriela Powell; her husband, Keith Powell; and Grove Operating LLC (the Powells). The final judgment incorporated partial summary judgments declaring that the Fair Parties have no easement across the Powells' real property and finding the Fair Parties liable to the Powells for trespass, slander of title, and tortious interference with existing contract. The Powells cross-appeal the denial of damages on their slander-of-title and tortious-interference counterclaims, which were based on the loss of the sale of their house after Fair, through her attorney, misinformed a buyer about her alleged easement. For the

reasons explained, we will modify the trial court's judgment and as modified, affirm the judgment in part; and reverse and render judgment in part.

## BACKGROUND[1]

Janis Fair is the president and sole owner of River Rock Event Center, Inc. The Fair Parties own property in Comal County that includes a guesthouse parcel and an event-center parcel. The Fair Parties contend that their property is landlocked and accessible only by Saratoga Lane. Saratoga Lane runs in front of the Powells' house on adjacent property, which they bought and later transferred to their LLC, Grove Operating. The geographic relationship between the properties is shown in a diagram from the summary-judgment evidence.



---

[1] The facts are taken from the parties' evidence submitted when litigating the partial summary-judgment motions and the bench trial on damages.

The Fair Parties do not dispute this diagram, but Fair testified during her deposition that she lacked personal knowledge of it and denied knowing who owned the portion labeled as the "Powell Property."

The Fair Parties and the Powells acquired their properties after a series of family conveyances reflected in the Comal County Official Records. In the 1950s, Fair's in-laws at the time, Ralph E. Fair, Sr. and Dorothy Exline Fair, deeded all the above-depicted parcels to Ralph E. Fair, Inc. In 1998, Fair, Inc. imposed residential-use restrictions applicable to all lots to be held, sold, and conveyed in the Fair Oaks Ranch subdivision, except the guesthouse parcel referenced as "Lot 1860-C," which is allowed to continue its existing commercial use. Fair, Inc.'s 1998 warranty deed shows its subsequent sale of the commercial-use guesthouse parcel, referenced as "Lot 1860, Fair Oaks Ranch Unit C-5," to Fair and her then-husband, Ralph E. Fair, Jr. (the Fairs). Fair, Inc.'s 2002 warranty deed shows that it also sold to the Fairs the 2.13-acre event-center parcel. The Fairs' 2003 warranty deed shows their conveyance of the event-center parcel to their entity, Fair Trading Post, Ltd.

In 2005, as part of the Fairs' separation agreement, Fair, Jr. conveyed the event center and guesthouse parcels to Fair. A 2013 warranty deed filed after the Fairs' separation shows that Fair, Inc. sold a 60.77-acre tract—including a 33.371-acre tract that would become the Powell property—to Fair, Jr. "as his sole and separate property." Fair, Jr.'s 2020 warranty deed with vendor's lien shows his sale of the 33.371-acre tract to the Powells. And the Powells' 2021 assumption warranty deed shows their transfer of the Powell property to their LLC, Grove Operating.[2]

---

[2] We refer to the 33.371-acre tract that the Powells bought and transferred to their LLC as the "Powell property" or the "Powells' property."

Before the Powells bought the 33.371-acre tract from Fair, Jr., he executed an affidavit confirming his ownership of the entire tract and that Fair had no property interest in it. Specifically, Fair, Jr. averred that he had owned the property since July 1, 2013; he had used the main building on this property as an office since 1991; he had allowed Fair to use the asphalt road on his land for her occasional events at River Rock Event Center; Fair has a dirt road on her own property by which she can access the River Rock Event Center from a public road called Keeneland Drive; he allowed Fair and her event guests to use his asphalt road because it is nicer; this arrangement had always been by his casual permission for Fair's convenience; he had never entered into any formal access agreement or arrangement of any type with Fair other than a January 1, 2019 agreement for parking and access during River Rock Event Center events; the agreement would expire July 1, 2020, and he could terminate it if the property were sold; he was the owner of the entire property, including the asphalt road; Fair had no property interest in the asphalt road or any portion of the property; and he never communicated to Fair or led her to believe that she had a property interest in the asphalt road or any other portion of the property.

Based in part on these averments, the Powells purchased the 33.371-acre property on June 22, 2020, and began renovating the residence on the property, which was built in 1881. On July 1, 2020, Fair's then-attorney requested that the Powells renew the parking-and-access agreement. The Powells were amenable to such temporary access because of the time required to complete their home renovations, and they sent a temporary-access agreement to Fair's attorney. He responded that instead, Fair wanted a permanent easement over the Powells' driveway. Fair refused to sign the temporary-access agreement and did not try to negotiate anything else. After Fair rejected the temporary-access agreement that the Powells offered, the parties stopped communicating with each other for months.

4

Fair testified during her deposition that she refused to sign an agreement to use the road because she thought it was hers to use, and she "just assumed" she had permission to use it because she had done so for twenty years. Her use of the roadway during that time was not exclusive. Fair and her event-center tenants and their patrons traveled to and from her event-center property using a dirt road from Keeneland Drive, which has existed since before the recording of the residential-use deed restrictions in 1998. She recalled that the dirt road existed "on [a] very old copy of [a map of] the ranch." She improved the road to Keeneland Drive using only gravel because paving it would be expensive, and she wanted an easement for use of Saratoga Lane instead.

The Powells were concerned about safety risks to themselves and their children—and diminished use and enjoyment of their property—posed by Fair's event-center patrons using the Powells' driveway, potentially after consuming alcohol. The Powells constructed a gate at the entrance to their driveway that could be opened only with a gate code, and starting August 14, 2020, they closed the gate. They notified Fair about the gate closure beforehand and that opening it would require a code. Fair was displeased with the gate. Several months after the Powells closed their gate on Saratoga Lane, Fair sent an email to them stating, among other things, that she had ordered some orange barrels to mark off the Powells' driveway and that the Powells should alert their clients, guests, and employees about this driveway division, which "seem[ed] to block [their] parking area." Fair testified that after installing the barrels, she and the event center's tenants and visitors used the roadway from Keeneland Drive. Fair eventually removed the barrels but was unsure why she did so.

***The Powells execute contract to sell their property, and the Fair Parties sue alleging implied easement***

Just over two years after purchasing the Powell property, in August 2022, the Powells executed a contract with Sensus Capital Group, LLC for the sale of their home. Closing was to occur on or before December 30, 2022. Sensus Capital's realtor, Kyle Gunter, called Fair a few weeks after the contract was signed and told her that he was "involved with" the buyer of the Powell property, that the buyer was in the process of purchasing that property, which was under contract, and that the buyer was also interested in purchasing Fair's event-center property. Fair indicated disinterest in selling it. She sought out the buyer after learning about the imminent sale, and her attorney[3] attempted to reach an agreement about her alleged easement with Sensus Capital's counsel.[4]

On September 29, 2022, within a month of learning about the sale of the Powell property, the Fair Parties sued the Powells alleging that the Powells blocked the driveway in front of their home on Saratoga Lane and caused Fair's property to be landlocked. Among other claims, the Fair Parties sought a declaration of their entitlement to an implied easement by necessity that included use of the Powells' driveway. The Fair Parties also applied for an

---

[3] Fair does not specify which of her attorneys reached out to the buyer's counsel. She testified that she had "gone through three or four attorneys," and the record similarly indicates that at least four different attorneys represented her in this matter.

[4] The Fair Parties attempt to distance themselves from their counsel's acts of contacting and communicating with the buyer, but they are presumed bound by their counsel's acts unless conclusively shown otherwise, which was not done here. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) (recognizing that in our system of representative litigation, each party is deemed bound by acts of their chosen lawyer-agent and cannot avoid consequences of acts or omissions of their freely selected agent); *accord Phan v. Quesada*, No. 04-23-00641-CV, 2024 WL 4969141, at *4 (Tex. App.—San Antonio Dec. 4, 2024, no pet.) (mem. op.) (noting that attorney appearing for party is presumed authorized to do so and that this presumption prevails until conclusively shown by competent evidence that attorney's appearance was unauthorized).

ex parte temporary restraining order requiring the Powells to open the gate or provide a gate code. At the TRO hearing, the trial court questioned counsel about the "other access road," the nonexistence of an easement in the Powells' deed, and Fair's nonexclusive use of the alleged "easement road." The trial court granted the TRO stating, "the good thing is what you're asking for is simply a 14-day use because on the long term[,] I think you've got a difficult case." The Fair Parties' TRO was extended multiple times while the Powells' property was under contract.

On December 15, 2022, about two months after suing the Powells, the Fair Parties' then-counsel, Roger Bresnahan, emailed counsel for Sensus Capital proposing a perpetual easement agreement for Fair and opining that Fair already had an easement by necessity: "[T]he easement will need to run with her land and can't expire if Ms. Fair sells to anyone else. She has an easement by necessity, clearly under the law." Bresnahan's email, which was copied to the Powells' counsel and others, also stated that while the sale between the Powells and Sensus Capital was pending, Fair's tenant—another nonparty to the Powell property contract—wanted assurance that he could continue using the Powells' driveway: "David Brock, who I am copying in this email represents the tenant to my client's property, a Mr. Love[, who] wants to confirm that he will be able to continue to access the event center through Saratoga Lane pending the sale of the property owned by the Powell[s] and Grove Operating."

Despite these statements in Bresnahan's email, during her deposition Fair denied knowing that the Powells had entered into a contract to sell the Powell property, denied telling her tenant Love that she claimed an easement or right to use the roadway across the Powell property, denied knowing how Love formed the opinion that she claimed an interest in the Powell property, denied instructing her lawyer to claim an easement across the Powell property

7

on her behalf, and denied having her lawyer reach out to the Powells' lawyer. She testified that Bresnahan reached out to the Powells' lawyer "without [her] permission."

At the hearing on the Fair Parties' temporary-injunction application, Fair testified that she has no written agreement giving her an easement, that there is a gravel road connecting the event center to Keeneland Drive, that the gravel road connecting the event center to Keeneland Drive does not go over anyone else's property before getting to Keeneland, and that her three income sources were from the event center, social security, and a trust fund. Keith Powell testified at the same hearing that Fair's published advertisements for the event center used an address on Keeneland Drive; that Sensus Capital expressed interest in recombining the event-center parcel, the guest-house parcel, and the Powell property; and that after the Powell property went under contract, the Fair Parties sued and clouded the title. He further testified that the contract's closing deadline was extended repeatedly while Sensus Capital tried negotiating with Fair, but those efforts were unsuccessful. Sensus Capital terminated its contract with the Powells and received a refund of its earnest money.[5] After the Powells lost their home sale, they counterclaimed against the Fair Parties for slander of title, tortious interference with existing contract, and trespass, and sought a declaration that Fair had no easement.

At the end of the temporary-injunction hearing, the Fair Parties requested leave of court to amend their unverified pleadings, *see* Tex. R. Civ. P. 682 ("No writ of injunction shall be granted unless the applicant therefor shall present his petition to the judge verified by his affidavit and containing a plain and intelligible statement of the grounds for such relief."), to submit documentation showing that the City of Fair Oaks had zoned the Keeneland roadway as

---

[5] Sensus Capital's feasibility period expired before the Powells were sued, but it retained the ability to terminate the contract and have its earnest money refunded under a lawsuit-related exception in the title agreement.

residential-only,[6] and to present case law supporting their assertion of an easement by necessity. The trial court granted the requested leave, took the matter under advisement, and then denied the temporary injunction, prohibiting Fair, her employees, agents, servants, customers, independent contractors, subcontractors, suppliers, and visitors from accessing the Powells' property or driveway without written consent.

Once the Fair Parties' temporary-injunction application was denied, the Powells locked their gate. Fair went onto the Powell property anyway. She addressed several such instances in her deposition. One time while Fair was operating a mower on Saratoga Lane, Fair's mower hit the post holding the keypad for the Powells' gate and damaged the gate-controller system. Fair emailed Keith Powell stating, in relevant part, "I want to let you know that last night while mowing along the road and the entrance, my mower accidentally bumped the post that holds your key pad and the pad fell off.· Darn." She stated her unwillingness to pay for the gate-controller system's repair. Another time, Fair drove her mower onto the Powell property to dispose of a dead fawn, which she dropped off there. Yet another time, she dumped leaves and brush on the Powell property. She denied having consent to access the Powell property before any of these instances.

***Partial summary judgments and final judgment***

The Powells filed two motions for partial summary judgment and prevailed on both. *See* Tex. R. Civ. P. 166a(c).[7] The first partial-summary-judgment order recited that the Fair Parties "do not have an easement over [the Powell] Defendants' real property." The second

---

[6] The Fair Parties did not provide any such zoning documentation, nor did they explain the relevance of that alleged zoning to the Keeneland roadway over the guesthouse parcel, which is by deed excepted from residential restrictions. And the Powells provided a letter from an assistant city manager for the City of Fair Oaks denying that the city was prohibiting Fair from using her driveway off Keeneland Drive for commercial purposes to access her event center.

partial-summary-judgment order found the Fair Parties liable to the Powells for slander of title, tortious interference with existing contract, and trespass. Having determined the Fair Parties' liability on the Powells' counterclaims, the trial court conducted a bench trial on damages.[8]

The final judgment awarded the Powells $179,950.60. This consisted of $59,164.23 for costs of maintaining ownership of their property after loss of the sale to Sensus Capital; $2,535.00 for trespass; $4,881.05 in prejudgment interest for loss of the sale plus $257.52 of additional damages while the suit was pending for Fair's trespass and damage to the Powells' property; $113,112.80 in attorney's fees on the Powells' declaratory judgment, and $30,000 in conditional appellate attorney's fees. The trial court awarded no damages on the Powells' slander-of-title and tortious-interference counterclaims, finding insufficient evidence to support them. The trial court addressed the bases for its judgment more fully in findings of fact and conclusions of law, including the following:

### FINDINGS OF FACT

1. On or about August 5, 2022 Grove Operating LLC entered into a Commercial Contract-Improved Property with Sensus Capital Group, LLC, which contemplated the sale of the Powell Property to Sensus Capital Group, LLC for a sale price of $2,100,000.00, which was receipted by Kendall County Abstract Company on said date; []

---

[7] The Texas Supreme Court amended Texas Rule of Civil Procedure 166a, but "[o]ther than the deadline changes, Rule 166a's rewrite is not intended to substantively change the law." 89 Tex. B.J. 286, 292 (2026). The amendments renumbered the rule's provisions. *Id.* at 289-292. Because the amendments apply only to summary-judgment motions filed on or after March 1, 2026, *id.* at 286, and the filing of Powells' summary-judgment motion preceded the amendments, we refer to the provisions of Rule 166a in effect at the time. *See id.*

[8] When trial began, the Fair Parties withdrew all their remaining claims against the Powells, and the trial court noted that the injunctive-relief application in the Fair Parties' live pleading was mooted by the court's prior rulings rejecting the easement-by-necessity allegation.

2. On September 29, 2022 Janis Fair and River Rock Event Center, Inc. initiated litigation against Gabriela and Keith Powell and Grove Operating LLC, claiming an easement by necessity across the Powell Property to access Saratoga Lane, even though Janis Fair[']s Property had a functional and improved roadway directly onto Keeneland Drive; []

3. Janis Fair interacted directly (through her legal counsel) with the prospective purchaser of the Powell Property. The prospective purchaser of the Powell Property was unable to acquiesce to the demands of Janis Fair and her entity pertaining to an easement across the Powell Property; []

4. By the time that Janis Fair and River Rock Event Center Inc. initiated their legal action against Gabriela Powell, Keith Powell and Grove Operating LLC, the feas[i]bility period for the prospective purchaser for the Powell Property had already expired. At that juncture, the prospective purchaser only had the ability to terminate the contract and retrieve their earnest money pursuant to a lawsuit-related exception existing in the operable title agreement. The prospective purchaser's title objection period had otherwise long since passed; []

5. The prospective purchaser extended the closing of the Powell Property multiple times, but ultimately, on January 31, 2023[,] terminated the contract and was refunded its earnest money deposit; []

6. During the course of this litigation, even when Plaintiffs had no identifiable right to access the Powell Property or Powell Driveway, after May 18, 2023, Plaintiffs and their tenants/patrons/invitees/contractors continued to access and drive across the Powell Driveway and Powell Property to reach the Event Center Parcel from Saratoga Lane, despite repeated requests to cease and desist from such actions. On June 6, 2023 Janis Fair damaged the gate at the entrance to the Powell Property/Powell Driveway from Saratoga Lane; []

7. Such conduct by Plaintiffs from May 18, 2023 through August 2023 was in violation of the terms contained in the *Order Denying Plaintiffs' Request for Temporary Injunction* which had been previously issued by the Court herein on June 1, 2023; []

. . . .

11. Defendants incurred additional costs of having to maintain ownership of their Property after the loss of the sale to Sensus Capital Group, LLC; and

12. The total sum of all damages awarded to Defendants against Plaintiffs is $179,950.60, being the aggregate of the amounts set forth under Conclusions of Law[.]

11

## CONCLUSIONS OF LAW

1. Plaintiffs committed, and are therefore liable to Defendants for Slander of Title; however, the Court was not presented with credible evidence to establish damages, therefore, the amount of damages is $0.00; []

2. Plaintiffs committed, and are therefore liable to Defendants for Tortious Interference with Existing Contract; however, the Court was not presented with credible evidence to establish damages, therefore, the amount of damages is $0.00; []

3. Defendants incurred additional costs of having to maintain ownership of their Property after the loss of the sale to Sensus Capital Group, LLC in the amount of:

   A. Note payments (from February, 2023 to May, 2024) in the amount of $50,190.44; []

   B. Property Taxes paid in 2023 in the amount of $6,791.79; []

   C. Insurance in the amount of $2,182.50; []

4. The sum of the afore-mentioned amounts totals $59,164.23, and is awarded against the Plaintiffs, Janis Fair and River Rock Event Center, Inc., and in favor of the Defendants; []

5. Plaintiffs committed, and are therefore liable to Defendants for Trespass upon the Defendants' real property located at 30260 Saratoga Lane ("Powell Property"); []

6. Defendants' damages on their Trespass claim brought against Plaintiffs include-

   A. The Plaintiffs' damage to Defendants' gate operation keypad and opening mechanism, in the sum of $535.00; []

   B. The removal costs associated with Plaintiffs' dumping of detritus on the Defendants' Property, in the amount of $2,000.00 for an award to Defendants for Plaintiffs' Trespass of $2,535.00; []

7. Defendants are entitled to pre-judgment interest accruing at an interest rate of 8.25% in the amount of $4,881.05 based upon the Defendants' loss of the sale of their property in early 2023, and an additional $257.52 based upon the additional damages incurred by Defendants during the pendency of this

12

lawsuit based upon Plaintiff Janis Fair's trespass and damage to the Defendants' Property; []

8. Defendants[] are entitled to damages for attorney's fees for their Declaratory Judgment in the sum of $113,112.80, awarded against Plaintiffs; []

9. Defendants are entitled to an additional $30,000.00 in attorney's fees in the event of an appeal by the Plaintiffs that is ultimately unsuccessful, with [remittiturs possible depending on whether a petition for review is filed and what actions the Texas Supreme Court takes on the petition].

These appeals followed.

## DISCUSSION

The Fair Parties contend that the trial court erred by (1) granting the partial summary judgment declaring that the Fair Parties had no easement over the Powells' property when the Fair Parties established the elements for an implied easement by necessity and prior use; (2) granting partial summary judgment on the Powells' tortious-interference-with-existing-contract and slander-of-title counterclaims when the Fair Parties conclusively established the affirmative defenses of justification and judicial-proceedings privilege; (3) awarding damages to the Powells for loss of sale;[9] and (4) awarding attorney's fees to the Powells when the trial court awarded them no damages for tortious interference with existing contract.[10] On cross-appeal, the

---

[9] The Fair Parties' challenge to the damages awarded in the final judgment fails to direct their complaint to any of the trial court's specific fact findings. A party appealing from a nonjury trial in which the trial court made findings of fact and conclusions of law should direct an attack on the sufficiency of the evidence at specific fact findings, rather than at the judgment. *Fee Prop. Co., LLC v. Venegas*, No. 05-24-00713-CV, 2025 WL 1909394025, at *2 (Tex. App.—Dallas July 9, 2025, pet. denied) (mem. op.). However, a challenge to an unidentified finding of fact may be sufficient if we can fairly determine from the argument the specific fact finding that appellant challenges. *See id.* We will address the Fair Parties' challenge to unidentified fact findings on damages as we can fairly determine from their argument.

[10] The Fair Parties' list of issues presented differs from those they briefed. We confine our opinion to the briefed issues. *See* Tex. R. App. P. 38.1(i) (requiring brief to contain clear and concise argument for contentions made, with appropriate citations to authorities and record).

13

Powells contend that the trial court erred by concluding that there was insufficient evidence to support any damages for their counterclaims.

When, as here, a final judgment resolves some claims through summary judgment and others through a bench trial, we apply separate standards of review to each portion. We review the summary-judgment portion of the final judgment de novo, affirming if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.[11] *American Guarantee & Liab. Ins. v. ACE Am. Ins.*, 990 F.3d 842, 846 (5th Cir. 2021) (applying Texas law); *see* Tex. R. Civ. P. 166a(c). We review challenged findings of fact from the bench-trial portion of a final judgment for legal and factual sufficiency of the evidence, and we review the trial court's legal conclusions de novo. *See American Guarantee & Liab. Ins.*, 990 F.3d at 846; *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Brazos Valley Roadrunners, LLC v. Niles*, No. 10-21-00278-CV, 2022 WL 1789978, at *1 (Tex. App.—Waco June 1, 2022, no pet.) (mem. op.).

## I. Fair Parties' appeal

### A. Partial summary judgment declaring nonexistence of easement

The Fair Parties contend that the trial court erred by granting the partial summary judgment declaring that they had no easement over the Powells' property when they established the elements for an implied easement by necessity and prior use. According to the Fair Parties' live pleading when the first summary judgment was heard, "There is a strict necessity for the

---

[11] We review declaratory judgments under the same standard as other judgments or decrees. Tex. Civ. Prac. & Rem. Code § 37.010. Because the trial court rendered the declaratory judgment by summary judgment, we review the propriety of the trial court's declarations under the same standards applied to summary judgments. *Naumann v. Lee*, No. 03-11-00066-CV, 2012 WL 1149290, at *3 (Tex. App.—Austin Apr. 5, 2012, pet. denied) (mem. op.).

easement as Plaintiffs' Property is landlocked and there is no other way for Plaintiffs and their patrons to access the Property." The claimed easement is for use of the Saratoga Lane roadway.

For over a decade, Texas law has required courts adjudicating claims of implied easements for roadway access to assess them not as prior-use easements but as easements by necessity: "We clarify that courts adjudicating implied easements for roadway access for previously unified, landlocked parcels must assess such cases under the necessity easement doctrine." *Hamrick v. Ward*, 446 S.W.3d 377, 384 (Tex. 2014). Necessity easements have the less-forgiving requirements of strict and continuing necessity—an acknowledgment that roadways typically present more significant intrusions on servient estates than the improvements at issue in prior-use easements, such as utilities. *Id.* When a party's claimed easement concerns a roadway to access a previously unified, landlocked parcel, the party must pursue a necessity easement rather than a prior-use easement. *Id.* at 385.

To successfully assert a necessity easement, the party claiming the easement must demonstrate: (1) unity of ownership of the alleged dominant and servient estates prior to severance; (2) the claimed access is a necessity and not a mere convenience; and (3) the necessity existed at the time the two estates were severed. *Id.* at 382. A party seeking a necessity easement must prove both a historical necessity (meaning that the way was necessary at the time of severance) and a continuing, present necessity for the way in question. *Id.* Because a way of necessity is a temporary right that arises from the exigencies of the case, it terminates when the necessity terminates. *Id.* A necessity easement provides a means of roadway access to land only so long as no other roadway access exists. *Id.* (citing *Alley v. Carleton*, 29 Tex. 74, 78 (Tex. 1867) ("A way of necessity, however, must be more than one

15

of convenience, for if the owner of the land can use another way, he cannot claim by implication to pass over that of another to get to his own.")).

The Powells moved for partial summary judgment on the Fair Parties' claimed easement by necessity and/or prior use across the Powells' property. A defendant who conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). The Powells' summary-judgment evidence conclusively disproves that the Fair Parties had any strict and continuing necessity to use the Saratoga Lane paved roadway.

First, Fair, Jr.'s affidavit executed before he sold the 33.371-acre tract to the Powells confirmed his ownership of the entirety of that tract, including the asphalt road; that Fair had no property interest in the asphalt road or any portion of the property; that he never communicated to Fair or led her to believe that she had any such property interest in the asphalt road or any other portion of the property; and that her use of the asphalt road was solely a temporary, permissive one with a July 1, 2020 expiration date. The Fair Parties failed to address these averments besides stating that Fair, Jr. did not himself terminate the agreement.

Second, Fair testified that she, her tenants, and their patrons traveled to and from her event-center property using a dirt road from Keeneland Drive, and that this dirt road, which Fair has since improved with gravel, existed before the recording of the 1998 residential-use deed restrictions, but she "wants" the use of Saratoga Lane. Thus, her own testimony negates the pleaded assertions that the Fair Parties need an easement because there is no other roadway access for them and their patrons. The Fair Parties want to use the Saratoga Lane paved roadway instead of a dirt-and-gravel road that is less convenient, but that preference will not support an

16

easement by necessity. *See, e.g., Crone v. Brumley*, 219 S.W.3d 65, 70 (Tex. App.—San Antonio 2006, pet. denied) (holding that roadway sought as easement by necessity was not "necessary" given existence of available alternate route, even if that alternate route was "impassable" without four-wheel-drive vehicle, because that merely meant roadway sought as easement was more convenient).

Nevertheless, the Fair Parties contend that they lacked legal access to the event center because the City of Fair Oaks zoned the Keeneland roadway as residential-only, and the Fair Parties require commercial use. But the Powells point out that the Keeneland roadway extends over the guesthouse parcel, which is by deed excepted from residential restrictions. And the dirt roadway predates the 1998 residential-use deed restrictions. Moreover, the summary-judgment evidence includes an assistant city manager's letter denying that the city was prohibiting Fair from using her driveway off Keeneland Drive for commercial purposes to access her event center.

On this record, we conclude that the Powells met their burden of showing that there is no genuine dispute as to any material fact concerning the Fair Parties' alleged easement by necessity for roadway access and that the Powells are entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *American Guarantee & Liab. Ins.*, 990 F.3d at 846. Thus, the trial court did not err by granting partial summary judgment in favor of the Powells and declaring that the Fair Parties have no easement over the Powells' property. We overrule the Fair Parties' issue challenging the trial court's judgment declaring the nonexistence of the easement.

**B. Partial summary judgment on tortious interference and slander of title**

The Fair Parties also contend that the trial court erred by granting partial summary judgment on the Powells' tortious-interference-with-existing-contract and slander-of-title

counterclaims when the Fair Parties conclusively established the affirmative defenses of justification and judicial-proceedings privilege.[12] We turn to those two counterclaims, which must stand on their own merits for summary judgment, and consider the affirmative defenses.

Tortious interference with contract requires proof of (1) a valid contract subject to interference, (2) a willful and intentional interference with the contract, (3) an interference that proximately caused injury, and (4) actual damage or loss. *See Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017); *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 19 (Tex. App.—El Paso 2005, pet. denied). The summary-judgment evidence shows that the Powells entered into a $2,100,000 contract to sell the Powell property to Sensus Capital; Fair was a stranger to that contract but learned of it from Sensus

---

[12] The Powells contend that these affirmative defenses were untimely pleaded. Neither justification nor judicial-proceedings privilege were pleaded before the trial court ruled on the Powells' second partial summary judgment. *See* Tex. R. Civ. P. 94 ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any [ ] matter constituting an avoidance or affirmative defense"). An unpleaded affirmative defense raised for the first time on reconsideration of a summary-judgment ruling fails to preserve that defense for appeal because all issues must be raised in the summary-judgment response. *Id.* R. 166a(c); *Mosquera v. Pinarte*, No. 05-24-01288-CV, 2026 WL 362650, at *3 (Tex. App.—Dallas Feb. 9, 2026, no pet.) (mem. op.) (concluding that party waived unpleaded affirmative defense first raised when party sought reconsideration of summary judgment). The Fair Parties included these affirmative defenses in their motions for reconsideration, which did not attach any evidence. Justification was first pleaded in their "Answer and Motion for Reconsideration," filed weeks after the trial court's letter ruling granting the Powells' second motion for partial summary judgment. Judicial-proceedings privilege was added over a month later in the Fair Parties' "Amended Motion for Reconsideration and to Vacate Summary Judgment." This was followed by their "Second Amended Motion for Reconsideration and Vacation of Summary Judgment and Alternatively a Motion for New Trial," which the Powells moved to strike as untimely under the parties' court-approved Rule 11 agreement. The trial court made on-the-record rulings denying the motion to strike, stated that it would consider the reconsideration motion, and then denied that motion. *See Texas Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 850 (Tex. App.—Eastland 2022, no pet.) (noting that if trial court affirmatively indicates on record that it accepted or considered motion to reconsider filed after rendition of summary judgment, appellate court reviews summary judgment on grounds and proof in both prejudgment and post-judgment filings). Under these circumstances, the Fair Parties preserved their issue asserting that they conclusively proved their affirmative defenses.

18

Capital's realtor; Fair and her event-center tenants and their patrons had traveled to and from her event-center property using a dirt road from Keeneland Drive that existed before the residential-use deed restrictions were recorded in 1998, but she "wants" the use of Saratoga Lane; Fair's attorney told Sensus Capital's counsel in email exchanges that Fair had an "easement by necessity"; Fair's attorney drafted an easement agreement that he presented to Sensus Capital's counsel, noting that the easement would have to run with Fair's land and not expire if she sold to anyone else; the Fair Parties sued the Powells claiming an implied easement by necessity; Sensus Capital did not agree to the proposed easement for Fair and terminated the contract; and the Powells lost the sale. This evidence, which is undisputed and cannot be disregarded, meets the elements of a tortious-interference-with-contract claim. *See Marrs & Smith P'ship*, 223 S.W.3d at 22-23 (concluding that evidence established tortious interference with contract where defendant partnership inserted itself into negotiation of mineral-lease agreement even though it did not have any legal right or colorable legal right to do so). Thus, the Powells carried their summary-judgment burden as to this counterclaim.

Slander of title requires proof of a (1) false and malicious statement (2) made in disparagement of title to property (3) that caused the loss of a specific, pending sale. *Allen-Pieroni v. Pieroni*, 535 S.W.3d 887, 887 (Tex. 2017). The summary-judgment evidence shows that despite Fair's knowledge of the dirt road connecting her event center to Keeneland Drive—a dirt road that existed before the recording of the residential-use deed restrictions in 1998 and was depicted "on [a] very old copy of [a map of] the ranch"—she made false statements about her property being landlocked and requiring access, which her attorney then communicated to counsel for the buyer, who was already under contract to purchase the Powells' property, in attempt to obtain a perpetual easement. Those statements were malicious because

19

Fair knew the falsity of her claim that her property was landlocked, but she deliberately and unreasonably persisted in representing to others that she had no access for her event center without the use of Saratoga Lane. *See Horizontal Dev. Partners, LLC v. Endeavor Energy Res., LP*, 715 S.W.3d 439, 450 (Tex. App.—Eastland 2025, no pet.) (noting that in slander-of-title context, "'malice' means 'deliberate conduct without reasonable cause'" and whether party's claim of title constitutes malice turns on whether its claim is made "under color of title or upon reasonable belief" that party has title); *Ramsey v. Davis*, 261 S.W.3d 811, 818 (Tex. App.—Dallas 2008, pet. denied) (defining malice as deliberate conduct without reasonable cause and concluding that party acted with malice because of his knowledge of falsity of encumbrance that clouded title to property and his retention of that encumbrance while sale of property was pending). Fair's statements disparaged the Powells' title to the Powell property by making it appear that Fair had a property interest encumbering the title to the Powell property. *See Eagle Rock Ranch, Inc. v. Drye*, 347 S.W.2d 730, 742 (Tex. App.—Austin 1961) (rendering judgment for property owners in slander-of-title suit and expunging clouds on title to their property that were cast by nonexistent easements), *aff'd*, 364 S.W.2d 196 (Tex. 1962). Fair's attorney told counsel for the buyer that Fair—a stranger to the contract—required a perpetual easement: "[T]he easement will need to run with her land and can't expire if Ms. Fair sells to anyone else. She has an easement by necessity, clearly under the law." After extended negotiations stemming from those statements and easement demands, Sensus Capital terminated the sale. This evidence, which is undisputed and cannot be disregarded, meets the elements of a claim for slander of title. Thus, the Powells carried their summary-judgment burden as to this counterclaim.

20

### 1. Justification

The Fair Parties assert that even if these counterclaims are established, they conclusively proved the affirmative defenses of justification and judicial-proceedings privilege. We consider each of these affirmative defenses in turn.

The party asserting justification in response to a claim of tortious interference with a contract "does not deny the interference." *Sterner v. Marathon Oil Co*., 767 S.W.2d 686, 689-90 (Tex. 1989). Rather, they are asserting a confession-and-avoidance defense, seeking to avoid liability based on a claimed interest that is being impaired or destroyed by another's contract. *Id.* at 690. As the party asserting the justification defense, the Fair Parties have the burden of proving it. *Id.*

Justification may be established by showing that (1) the interference was done in a bona fide exercise of the party's own legal rights; or (2) the party had a good-faith claim to a colorable legal right in the subject matter, even if that claim ultimately proves mistaken. *Personal Preference Video, Inc. v. Home Box Office, Inc*., 986 F.2d 110, 111 (5th Cir. 1993) (applying Texas law). A party establishes justification as a matter of law when the acts alleged as tortious interference are merely another's exercise of its own contractual rights. *Community Health Sys. Prof'l Servs. Corp.*, 525 S.W.3d at 697. The justification defense does not apply when the interference occurs by illegal or tortious means, such as misrepresentation. *Id.*

That is the case here. Fair misrepresented her "legal rights" to others by insisting her property was landlocked—despite actual knowledge that her representation was false because of the existing dirt-road alternative—in attempt to obtain a perpetual easement agreement from the Powells and from Sensus Capital. Texas law prohibits making false representations in real-estate transactions. Tex. Bus. & Com. Code § 27.01; *Fibela v. Wood*,

21

657 S.W.3d 664, 673 (Tex. App.—El Paso 2022, no pet.); *see Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 727 (Tex. 2020) ("an easement is an interest in real estate"). By affirming the first partial summary judgment on the Powells' requested declaratory relief, we have already determined that the Fair Parties possess neither an actual legal right, nor a good-faith colorable legal right, to an easement necessary for landlocked property; thus, they cannot prove justification on those two grounds. And even if we had not made those determinations, because Fair's interference with the Powells' contract was accomplished by misrepresentation, the Fair Parties' affirmative defense of justification fails.

### 2. Judicial-proceedings privilege

Next, the Fair Parties assert that they conclusively proved the applicability of the judicial-proceedings privilege, which is also an affirmative defense of confession and avoidance. *Marble Ridge Cap. LP v. Neiman Marcus Grp., Inc.*, 611 S.W.3d 113, 129-30 (Tex. App.—Dallas 2020, pet. dism'd). As the parties asserting the judicial-proceedings privilege, the Fair Parties have the burden of proving it. *See id.* at 138. Under the judicial-proceedings privilege, "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021). The "due course of a judicial proceeding" may include pre-suit communications "in serious contemplation of such a proceeding." *Id.* The privilege shields such communications regardless of the negligence or malice with which they are made, and it is commonly applied in cases alleging defamation. *Id.*

But the judicial-proceedings privilege does not apply to every type of claim. *Deuell v. Texas Right to Life Comm., Inc.*, 508 S.W.3d 679, 692 (Tex. App.—Houston [1st Dist.]

22

2016, pet. denied); *see Steadfast Ins. v. SMX 98, Inc.*, No. CIV.A. H-06-2736, 2009 WL 890398, at *21 (S.D. Tex. Mar. 30, 2009) (mem. op.) (noting that Texas Supreme Court "has not held that this privilege bars all civil causes of action arising from communications made during the course of a judicial proceeding"). To determine whether the privilege applies, we use a damages-focused test: the privilege extends beyond defamation to bar non-defamation claims only if the damages sought are essentially defamation or reputational damages, regardless of how the claim is labeled. *See Bird v. W.C.W.*, 868 S.W.2d 767, 771-72 (Tex. 1994) (extending privilege to negligence claim against psychologist who filed affidavit reporting child abuse, noting that damages sought—for past and future mental anguish and lost earnings—were "basically defamation damages"); *Deuell*, 508 S.W.3d at 692.

Texas courts have consistently limited the judicial-proceedings privilege to claims seeking reputational damages and declined to extend it to claims seeking only direct and consequential economic damages. *See Deuell*, 508 S.W.3d at 691-92 (holding that privilege did not apply to tortious-interference claim because claimant sought only direct and consequential contract damages); *Connor v. McMahan*, No. 03-23-00224-CV, 2024 WL 5248528, at *7 (Tex. App.—Austin Dec. 31, 2024, pet. denied) (mem. op.) (holding that privilege did not apply to claimant's request for declaratory relief); *Mireskandari v. Casey*, 636 S.W.3d 727, 739 (Tex. App.—Dallas 2021, pet. denied) (holding that privilege did not apply because essence of claim "was not damages but declaratory relief"); *Kyle v. Strasburger*, No. 13-13-00609-CV, 2019 WL 1487357, at *8 (Tex. App.—Corpus Christi–Edinburg Apr. 4, 2019, no pet.) (mem. op.) (holding that, to extent claims were based on statements made in judicial proceedings, those claims "d[id] not seek relief akin to reputational or mental anguish damages" and were not barred); *see also Tulloch v. JPMorgan Chase & Co.*, No. CIV.A. H-05-3583, 2006 WL 197009, at *7 (S.D. Tex.

23

Jan. 24, 2006) (holding that privilege did not apply to defendant's counterclaim seeking contract damages that flowed from alleged breach). Following this authority, we conclude that the judicial-proceedings privilege does not apply to the Powells' tortious-interference-with-contract counterclaim, a non-defamation cause of action seeking "actual damage or loss as a result of [their] lost sale" and "all damages for the *economic* injury they have suffered." *See Deuell*, 508 S.W.3d at 691-92. Because the Fair Parties failed to conclusively prove that the judicial-proceedings privilege applies to this counterclaim, their confessed interference with the Powells' contract for the sale of the Powell property constitutes actionable tortious interference under Texas law. We overrule the Fair Parties' issue asserting the judicial-proceedings privilege as to the tortious-interference-with-contract counterclaim.

By contrast, the Powells' slander-of-title counterclaim for "uttering and publishing disparaging statements about title to the Powell Driveway and Powell Property" is a defamation claim. It involves the type of communications by Fair and through her attorney, both pre-suit and during the course of the judicial proceedings below, that will not serve as the basis of a civil action against the Fair Parties. *See Landry's, Inc.*, 631 S.W.3d at 46. Such communications are privileged even when made maliciously. *Id.* We sustain the Fair Parties' issue asserting the judicial-proceedings privilege as to the slander-of-title counterclaim. [13]

---

[13] The Fair Parties inadequately briefed any argument challenging the second partial summary judgment on the counterclaim for trespass. *See* Tex. R. App. P. 38.1(i). The section of the brief listing their issues presented does not include trespass. An argument heading in the table of contents states, "There is[] legally and factually insufficient evidence[] to support either Appellees' claim or damages for 'trespass by others.'" After that, there are only these two references in the brief to trespass (and one alludes to a nonexistent claim for sanctions): (1) "Only the award for Trespass of $2535.00, is not dependent on tortious interference with an existing contract, and slander on title," and (2) "The claims for sanctions are equally without merit because Janis Fair has not intentionally violated a court order [n]or does she know why any unknown person would trespass." We are not required to make a party's arguments for them.

### C. Loss-of-sale damages in final judgment

In addition to their issues challenging the partial summary judgments, the Fair Parties contend that in its final judgment, the trial court erred by awarding damages to the Powells for loss of sale. Whether the trial court applied an improper measure of damages is a question of law that we review de novo. *Shaffer v. Frink*, No. 03-01-00564-CV, 2002 WL 822268, at *4 (Tex. App.—Austin May 2, 2002, no pet.) (mem. op.). The trial court's final judgment and its finding of fact number 11 state that the Powells incurred additional costs of maintaining ownership of their property after the loss of the sale to Sensus Capital Group, LLC. The judgment and conclusions of law numbered 3, 4, and 7 specify that after the lost sale, the Powells incurred additional costs to maintain ownership of their property totaling $59,164.23— $50,190.44 for note payments from February 2023 to May 2024; $6,791.79 for property taxes; and $2,182.50 for insurance—which the trial court awarded to them, along with $4,881.05 in prejudgment interest "based upon [their] loss of the sale of their property in early 2023."

The Fair Parties contend that "loss of sale" is an element of damages in a tortious-interference-with-contract action, but the trial court awarded no damages to the Powells on that counterclaim and could not have properly awarded loss-of-sale damages to them as an independent cause of action. We agree. The trial court granted the Powells' second partial

---

*See Litsinger v. Litsinger*, No. 03-25-00106-CV, 2025 WL 3533270, at *2 (Tex. App.—Austin Dec. 10, 2025, no pet.) (mem. op.). And even if the trespass issue were adequately briefed, Fair acknowledged in her deposition undisputed instances when she went onto the Powells' property without their permission, including when she damaged their gate-controller system. *See Environmental Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 419 (Tex. 2015) (defining trespass as (1) entry (2) onto property of another (3) without the property owner's consent or authorization); *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755, 757 (Tex. 2007) (concluding that appellate court erred by ignoring undisputed evidence in record that could not be disregarded). The Fair Parties would not be entitled to reversal on this issue. *See* Tex. R. App. P. 44.1(a) (setting forth reversible-error standard in civil cases).

summary judgment, determining in relevant part that the Fair Parties were liable to the Powells for tortious interference with existing contract. After trial, the court ruled that the Powells failed to present credible evidence establishing their damages and awarded nothing on that counterclaim. Nevertheless, the final judgment awarded the Powells $59,164.23 for additional costs incurred to maintain ownership of their property after losing the sale to Sensus Capital, plus $4,881.05 prejudgment interest on that award. Neither amount was tied to any of the Powells' counterclaims.

Texas cases discuss loss of sale as an element of a claim for tortious interference with contract, not as an independent cause of action. *See, e.g.*, *Community Health Sys. Prof'l Servs. Corp.*, 525 S.W.3d at 689 (listing "actual damage or loss" as final element of claim for tortious interference with contract); *Wagner v. Hall*, 519 S.W.2d 488, 489-90 (Tex. App.—El Paso 1975, no writ) (concluding that broker was liable for homeowner's actual damages sustained when he was forced to sell his home at reduced price to second buyer after broker's agent tortiously interfered with contract by converting first buyer's earnest money payment and causing rescission of first buyer's contract with homeowner); *Cooper v. Steen*, 318 S.W.2d 750, 757 (Tex. App.—Dallas 1958, no writ) (concluding that pleadings and testimony about obstruction of plaintiff's efforts to sell her property, including that "sales ha[d] been lost" because of defendant's conversation with prospective buyers discouraging them from buying, presented prima facie case of tortious interference with sale of property). The Powells agree that "there is no cause of action for 'loss of sale,'" and their briefing addresses loss of sale only as an element of the damages that they seek to recover for tortious interference with existing contract.

Because loss-of-sale is not a separately compensable action, we conclude as a matter of law that the trial court erred by awarding loss-of-sale damages when it denied any

26

damages for the Powells' tortious-interference-with-contract counterclaim. *See Shaffer*, 2002 WL 822268, at *4. We sustain the Fair Parties' issue challenging the damages awarded only for loss of sale, and modify the final judgment to (1) delete the award of $59,164.23 (consisting of note payments, property taxes, and insurance) to the Powells for the costs of maintaining ownership of the Powell property after the lost sale to Sensus Capital, and (2) delete the corresponding award of $4,881.05 prejudgment interest for the loss of that sale.

### D. Attorney's fees award in final judgment

The Fair Parties also challenge the final judgment by contending that the trial court's award of attorney's fees to the Powells was an abuse of its discretion because it awarded them no damages on their cause of action for tortious interference with existing contract. *See* Tex. Civ. Prac. & Rem. Code § 38.01. Generally, a party may not recover attorney's fees unless the fees are authorized by statute or contract. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019); *Duncan Land & Expl., Inc. v. Littlepage*, 984 S.W.2d 318, 333 (Tex. App.—Fort Worth 1998, pet. denied) ("In order to be awarded attorney's fees, a party must show the fees were incurred during the prosecution of a suit for a cause of action for which fees are allowed."). Attorney's fees are available in a suit for a declaratory judgment. *See* Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter [Uniform Declaratory Judgments Act], the court may award costs and reasonable and necessary attorney's fees as are equitable and just."); *Duncan Land & Expl., Inc.*, 984 S.W.2d at 333. The grant or denial of attorneys' fees in a declaratory-judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985).

Here, the Powells prevailed on their request for declaration of the nonexistence of an easement. Texas courts have recognized that a party may invoke the UDJA to determine their rights of ingress and egress and, more specifically, to clarify their rights with respect to easements. *Robinson v. Riddick*, No. 04-15-00272-CV, 2016 WL 1238166, at *6 (Tex. App.—San Antonio Mar. 30, 2016, no pet.) (mem. op.) (affirming attorney's fees award in suit where parties sought declaration of their rights as to use of roadway); *Steel v. Wheeler*, 993 S.W.2d 376, 381 (Tex. App.—Tyler 1999, pet. denied) ("We hold that invoking the Declaratory Judgments Act to determine rights of ingress and egress is proper."). The Fair Parties failed to brief the UDJA as an independent basis for the trial court's award of attorney's fees, stating only that the attorney's fees "for a Declaratory Judgment defense are unconscionable." Apart from this statement, the Fair Parties present no argument, analysis, or citation to authority advancing any argument that it was inequitable or unjust to award attorney's fees under the UDJA or that there was insufficient evidence supporting the trial court's award on this basis. *See* Tex. R. App. P. 38.1(i); *Mann v. Sikh Nat'l Ctr., Inc.*, No. 14-23-00272-CV, 2024 WL 3616685, at *3 n.3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2024, pet. denied) (mem. op.) (declining to address challenge to attorney's fees awarded under UDJA where party presented no supporting argument, analysis, or citation to authority); *In re A.L.H.*, 515 S.W.3d 60, 86-87 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (concluding that party waived assertion that attorney's fees award was "unconscionable" by not citing any authority for that assertion); *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *8 n.13 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op.) (noting that party's one-sentence challenge to amount of attorney's fees award waived that challenge); *Hazlewood v. Lafavers*, 394 S.W.3d 620, 632 (Tex. App.—El Paso 2012, no pet.) (concluding that party's failure to adequately brief challenge to

28

attorney's fees award waived alleged error).  Because the Fair Parties failed to brief the UDJA as an independent basis for the attorney's fees award, they did not preserve their challenge to it.[14] We overrule this issue.

## II. Powells' cross-appeal

On cross-appeal, the Powells contend that the trial court erred by denying damages on their slander-of-title and tortious-interference-with-contract counterclaims, challenging the legal and factual sufficiency of the evidence supporting the trial court's

---

[14] Even if this challenge were preserved, the Fair Parties did not present any evidence contesting the Powells' counsel's testimony about the reasonableness and necessity of the fees sought and the billing records addressing such factors as the particular services performed for this case, who performed those services, approximately when the services were performed, the reasonable amount of time required to perform the services, and the reasonable hourly rate for each person performing such services. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019).  The Powells' counsel provided detailed testimony including the following matters: his years of experience as an attorney licensed in Texas since 1989 and Illinois since 1990; his familiarity with real-estate principles in the area of law that he has practiced for most of his career; the extensive work performed in this case including exploration of "all the various types of easements available in Texas and why none of them were involved in this claim"; his reasonable, below-market billing rate in this part of Texas of $300 per hour and the reasonable, below-market billing rate of $250 per hour for another attorney who did much of the research and drafting in this case; his proffer of contemporaneous business records showing time entries with particular services performed and who performed them as part of the 384.4 hours billed from December 19, 2022, until the day before trial (not including time for trial preparation or the trial itself); his opinion that the time spent was necessary because of the novelty of the easement claims alleged and the counterclaims filed that were all related to each other and inextricably intertwined, plus a "very protracted temporary-injunction hearing"; his recollection that the total billed amount before trial was $102,652.77 including expenses of $2,862.77, mostly for e-filing fees and deposition-transcript costs; and his confirmation that all the expenses were for the exact amount incurred.

An opposing attorney's mere criticism of the amount of attorney's fees sought does not raise a fact issue regarding the reasonableness of the requested attorney's fees. *Ten-Booms v. Obregon*, No. 03-09-00713-CV, 2011 WL 2162884, at *13 (Tex. App.—Austin June 3, 2011, no pet.) (mem. op.).  Given the uncontroverted evidence presented at the bench trial on the reasonableness and necessity of the attorney's fees incurred in this suit and considering the absence of any opposing evidence from the Fair Parties, we conclude that there was no clear showing of an abuse of discretion in the trial court's award of attorney's fees to the Powells. *See Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985).

zero-damage award. The Fair Parties did not file a cross-appellees' brief. Because we have already determined that the judicial-proceedings privilege bars the Powells' recovery for slander of title, the trial court did not err by declining to award any damages on that counterclaim. We will limit our review of the Powells' cross-appeal to the zero-damage award on their counterclaim for tortious interference with contract.

"The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed." *American Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990); *Prowse v. Whitehurst*, 313 S.W.2d 126, 130 (Tex. App.—San Antonio 1957, writ ref'd n.r.e.) (op. on reh'g) (concluding that measure of damages for tortious interference was difference between contract price and real property's market value at time of breach). The Powells contend that the evidence at trial was sufficient to show damages for tortious interference with contract within a range of $1,351,457.45 to $1,626,873.[15] The trial court's final judgment and its conclusion of law number 2 recite that it awarded nothing on that counterclaim because it "was not presented with credible evidence to establish [the Powells'] damages." Although the trial court labeled this factual determination on credibility as a conclusion of law, we are not bound by that designation and will treat it as a finding of fact subject to the appropriate standard of review. *See Texas Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 n.7 (Tex. 2019); *Karbalai v. Solhjou*, No. 01-01-00371-CV, 2003 WL

---

[15] The Powells calculate the $1,351,457.45 amount using the $2,100,000 contract price, minus their $648,542.55 loan payoff at the time of the expected sale, minus their $100,000 down payment when they purchased the Powell property. They calculate the $1,626,873.00 amount using the $2,100,000 contract price, minus the Powell property's $473,127 claimed market value when the contract terminated.

1848448, at *6 n.12 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, no pet.) (mem. op.) (stating that trial court's "conclusion of law" about exact amount of damages party sustained was finding of fact and treating it as such).

Findings of fact in an appeal from a bench trial have the same weight as a jury verdict and are judged under the same appellate standards. *Id.* A party challenging the legal sufficiency of an adverse finding on an issue on which that party had the burden of proof at trial must demonstrate on appeal that the evidence conclusively established, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A party challenging the factual sufficiency of an adverse finding on an issue on which that party had the burden of proof at trial must demonstrate on appeal that the adverse finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.* Further, in a bench trial, the trial court is the sole judge of witness credibility and the weight to be given to their testimony. *Bekins Van Lines, Inc. v. Kahn*, 717 S.W.3d 86, 99 (Tex. App.—Austin 2025, pet. denied). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). We may not substitute our judgment for the trial court's just because we might reach a different conclusion. *Gonzales v. Gonzales*, 704 S.W.3d 54, 64 (Tex. App.—Austin 2024, no pet.).

There were only two witnesses at the bench trial: Keith Powell, who testified about the damages the Powells sought on their counterclaims, and the Powells' counsel, who testified about his attorney's fees. Keith testified that he paid $500,000 in 2020 for the Powell property; that he had a contract to sell the property in 2022 for $2,100,000; that the property was worth $500,000 according to the final 2023 Comal County Appraisal District valuation; and that

31

he would sell the property for $2,100,000.[16] Keith was asked what damage was sustained if he was previously able to obtain a contract to sell the property for $2,100,000, and he would still sell it for $2,100,000.[17] Keith replied that he did not reasonably expect he could get that price.[18] He was asked about the value of his property, given that land and homes appreciate in value. Keith replied that according to the Comal County Appraisal District's last official valuation, the property had a market value of $500,000.

Keith admitted that he had completed a $170,000 cash-out refinance of the home loan and put "a lot of money" into making improvements to the home, and that there was now an official ruling on the nonexistence of the easement on the Powell property, yet he was "unsure"

---

[16] We refer to this witness by his first name to distinguish him from the other Powell parties.

[17] Keith also testified that after the lost sale to Sensus Capital, he incurred additional costs to maintain ownership of the Powell property totaling $59,164.23, consisting of $50,190.44 for note payments from February 2023 to May 2024; $6,791.79 for property taxes; and $2,182.50 for insurance, and provided documentation for those payments. These consequential damages are recoverable only if damages for the primary pecuniary loss are proven, which the trial court found were not. *See, e.g.*, *Goldman v. Olmstead*, 414 S.W.3d 346, 363 (Tex. App.—Dallas 2013, pet. denied) (concluding that trial court erred by awarding claimants carrying costs of house for year following date of breach of contract for house sale where claimants failed to prove that they suffered any damages under correct legal measure of damages).

[18] Keith's testimony on the value of his real property is the type permissible under the "property owner rule," which falls under Texas Rule of Evidence 701 and allows an owner's opinion testimony about the value of his property. *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) (citing Tex. R. Evid. 701). The property-owner rule is based on the presumption that an owner is familiar with his property and its value, and it is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on land values. *Id.* at 157; *Balderas-Ramirez v. Felder*, 537 S.W.3d 625, 632–33 (Tex. App.—Austin 2017, pet. denied) (noting that issue of market value of owner's property is one on which expert testimony would otherwise be required). Under this rule, an owner's valuation testimony fulfills the same role as expert testimony, and because it is judged by the same standards, the owner must provide the factual basis for his opinion which, as here, may be challenged on cross-examination or refuted with independent evidence. *Natural Gas Pipeline Co.*, 397 S.W.3d at 157, 159.

whether the property's value had diminished. When asked whether most people will sell a home for more than its tax-appraised value, Keith stated that it would depend on the property. He acknowledged that evidence from the Comal County Appraisal District's website showed that the 2024 preliminary valuation for the Powell property was $1,522,940, but he noted that this value was contested and its official value had not yet been released.[19]

The record from the bench trial shows that the Powells did not conclusively establish, as a matter of law, all vital facts in support of their challenge to the zero-damages award for the tortious-interference-with-contract counterclaim. Rather, the trial court as fact finder in the bench trial, in determining the market value of the Powell property at the time of the lost sale, could have disbelieved Keith's testimony that the Powell property had not appreciated in value since 2020, after taking out $170,000 for renovations and spending "a lot of money" on improvements to the property. The trial court could have credited the evidence showing that the appraisal district had issued a preliminary value of $1,522,940 for the property in 2024 and discounted Keith's noncommittal response when asked whether most people sell a home for more than its tax-appraised value. Finally, the trial court could have credited toward its finding Keith's testimony that he was hoping to sell the Powell property for the same $2,100,000 that he had obtained in his 2022 contract price with Sensus Capital, resulting in no loss. Thus, we conclude that the evidence is legally sufficient to support the award of zero damages for the Powells' tortious-interference-with-contract counterclaim.

---

[19] In an exhibit to their cross-appellants' brief, the Powells provide the 2024 post-protest appraisal value for their property of $674,700. But this evidence was not presented to the trial court and is outside the record, so we do not consider it. *Bailey v. Gasaway*, No. 03-16-00281-CV, 2017 WL 3897283, at *1 n.1 (Tex. App.—Austin Aug. 22, 2017, pet. denied) (mem. op.).

Further, the evidence weighing against the trial court's no-damages finding was Keith's testimony that the only thing preventing him from getting $2,100,000 for the Powell property was "finding a purchaser who would pay that," that he did not reasonably expect he could get that price, and an exhibit attached to his cross-appellants' brief containing a 2024 post-protest appraisal value that was not presented during trial. The credibility of a testifying witness in a bench trial is a matter reserved to the trial court that we may not second-guess. *See McGalliard*, 722 S.W.2d at 697; *Bekins Van Lines, Inc.*, 717 S.W.3d at 99. We defer to that finding and do not substitute our judgment for the trial court's, even if we might reach a different conclusion. *Gonzales*, 704 S.W.3d at 64. We conclude that the trial court's zero-damage finding on this counterclaim is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule the Powells' cross-appellate issue.

## CONCLUSION

For the reasons explained, we modify the trial court's "Final Judgment after Trial on Merits" to delete the award of $59,164.23 for the costs of maintaining ownership of the Powell property after loss of the sale to Sensus Capital, and to delete the award of $4,881.05 prejudgment interest for the loss of that sale and, as modified, affirm the judgment in part; further, we reverse in part the trial court's second partial summary judgment finding the Fair Parties liable to the Powells for slander of title and render judgment that the Powells take nothing on that counterclaim.

_____

Darlene Byrne, Chief Justice

34

Before Chief Justice Byrne, Justices Crump and Ellis

Modified and, as Modified, Affirmed in Part; Reversed and Rendered in Part

Filed:   May 8, 2026